304 A.2d 898.

ANN F. SCANLON *et al., Co-Executrices of the Estate of George G. Farrayeh vs.* GABRIEL FARRAYEH.

MAY 22, 1973.

PRESENT: Roberts, C. J., Paolino, Kelleher and Doris, JJ.

KELLEHER, J. The defendant Gabriel Farrayeh is the brother of the plaintiffs. The plaintiffs, Ann F. Scanlon and Antoinette Lundgren, are the co-executrices of their father's estate. They have instituted civil action to set aside a certain conveyance of real estate made by the father to his son. After a nonjury trial held in the Superior Court, judgment was entered for the defendant. One of the sisters, Ann, has taken this appeal.

The record shows the following undisputed facts: On January 30, 1953, the litigants' widowed father went to the offices of a Central Falls attorney. He was accompanied by two of his daughters. The father had previously made a will devising one parcel of real estate located on Tremont Street in Central Falls to defendant, and another parcel, located in Attleboro, Massachusetts, to his six daughters. In January, 1953 he was keeping company with a widow and there was concern within the family as to what would be the effect of the father's possible remarriage[1] on his will. Apparently the father was agreeable to doing what was necessary to guarantee the eventual ownership by his son of the Rhode Island real estate and the daughters' future ownership of the Massachusetts property.

The attorney informed the father that a subsequent marriage could revoke his will, but he could accomplish his purposes by deeding the Massachusetts property to his daughters and deeding the Rhode Island property to his son, at the same time reserving to himself a life estate in each of the properties. Two deeds embodying these suggestions were prepared by the attorney and executed by the father on January 30, 1953.

On May 3, 1957,[2] the father, the son and the son's wife obtained from a bank a $2,000 mortgage on the Tremont Street property. The mortgage deed was prepared by the bank's attorney. Over a month later, on June 20, the son and his wife quitclaimed their interest in the real estate

---

[1]The father never remarried.

[2]The Tremont Street parcel consisted of what might be described as a two tenement house. In 1957, the son and his family occupied the first floor tenement. The father and his daughter Ann lived in the second floor tenement. At the time of the trial, the brother had vacated the premises. Ann has moved to the first floor. The second floor tenement is rented.

to the father. A short time thereafter, on July 26, the father deeded the property back to his son, once again reserving to himself a life estate. The last two conveyances were prepared and executed by the attorney with whom the father had consulted four years earlier in January, 1953.

One of the exhibits is a June, 1958 deed where the father deeded his interest in the Central Falls real estate to his six daughters and son as tenants in common.

The Massachusetts property was sold in June, 1962. The proceeds of the sale were divided among the daughters and their father. The father died on August 28, 1970, leaving a will dated August 14, 1968 whereby all that he owned, with the exception of a few items of tangible personal property, was to be divided equally among all of his living children.

The father could not read or write English and signed all the deeds which have been mentioned by making an "X." The Central Falls attorney is a linguist who speaks Arabic, the father's native tongue. The plaintiff is seeking to set aside the July 26, 1957 deed. There is no doubt that sometime after its execution, the good will that had existed between the father and the son diminished considerably. An attorney whose offices were in Pawtucket prepared the June, 1958 deed from the father to the daughters and son. He admitted that there was a language barrier because he could not speak Arabic. He made no effort to check the present status of the title. He used a description which was apparently taken from a deed given him by the daughter. Evidently the deed she gave him was the deed the father received when he and his wife purchased the property in 1940. One of the daughters had acted as the interpreter and this attorney told the trial justice that the father's facial expressions and mannerisms gave him the impression that the father understood what was going on.

The trial justice heard contradictory versions of an event

that transpired shortly after the execution of the July, 1957 deed.

The plaintiff Ann testified that when her father was told about the reconveyance of the property to his son, that she and her father went to the lawyer's office, that her father told the lawyer that he had never signed "no papers, no deed" and that the lawyer told the father not to be upset and that thereupon the lawyer destroyed "some papers."

The attorney testified that the daughter and the father had indeed come to his office; that the lawyer had, at the request of Ann prepared an affidavit which was to be signed by the father; that the affidavit related how the daughter could not work because she cared for her father; that the affidavit was required by the welfare authorities so that they could continue making payments to Ann; that when the father was informed of the affidavit's contents, he ordered the attorney to destroy it and that it was destroyed.

The attorney emphasized that while the father could not read or write any language, he could understand Arabic when it was spoken. This witness identified the father as his client. The mortgage proceeds, he said, were to be used to make some repairs and improvements to the Tremont Street property. It was observed that more money was needed to complete the home improvement program, but defendant's wife was reluctant to assume any further indebtedness. The deed from the son and his wife back to the father was done at the suggestion of an official at the bank because the father could then apply for another mortgage. Some time later, the father came to his attorney's office. He told the attorney that the additional money had been obtained without the necessity of going to the bank. He asked that the original status of the title be restored. The attorney stated categorically that when he spoke to the father on July 26, 1957, he told him in Arabic that his signing the deed would mean that after the father died the

property would go to his son. This witness also stated that the father told him he had signed the June, 1958 deed because a daughter had told him he had to sign "some papers" so that they could evict a tenant from the Massachusetts property.

The plaintiff recognizes that findings of facts made by a trial justice are entitled to great weight and will not be disturbed by us unless they are clearly wrong. However, Ann now espouses a rule that would hold an illiterate's deed as being ineffectual to pass title unless it was read to him *word by word*. As support for this proposition, plaintiff refers us to certain attestation clauses found in various form books. The following is typical of the ones alluded to by plaintiff. It is found in 5 American Jurisprudence Legal Forms Annotated §324 at 174. It reads as follows:

> "The foregoing instrument was signed by the above named John Smith by his mark, he being unable to write and the said instrument having been previously read to him and thereupon he having stated that he signed, sealed and delivered the instrument in the presence of
>
> _____
>
> (Signature of witnesses.)"

With all due deference to the draftsmen of the forms found in the plaintiff's brief, a word by word recitation of a deed's contents offers little, if anything, to an illiterate's, or even a literate's, understanding of an instrument which he may be asked to sign. The deeds running from the father to his children have a liberal sprinkling of such terms as "tenants in common," "quitclaim covenants," "grantor," "rents," "issues," "profits," "consideration" and "possession to be surrendered to the grantees at the death of the grantor." We have little doubt that a reading of such legalese would have added nothing to the father's understanding of what he was doing. What is important is an explanation, not a recitation! The trial justice observed

that the July, 1957 deed was executed by the father with full knowledge and understanding of its effects and consequences. There is nothing in this record which would warrant a reversal of this finding.

The plaintiff's appeal is denied and dismissed.

Mr. Justice Joslin did not participate.

*Kirshenbaum & Kirshenbaum, Alfred Factor,* for plaintiff.

*James M. Shannahan,* for defendant.